KENNEDY, to Use of BOGASH v. ÆTNA INS. CO.*

SAME v. SPRINGFIELD FIRE & MARINE INS. CO.

SAME v. LIVERPOOL & LONDON & GLOBE INS. CO., LIMITED.

Nos. 5859–5861.

Circuit Court of Appeals, Third Circuit.

Jan. 16, 1936.

Rehearing Denied Jan. 29, 1937.

Harry Shapiro, of Philadelphia, Pa., for appellant.

Harry S. Ambler, Jr., and Horace M. Schell, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

These are appeals from judgments of the District Court for the Eastern District of Pennsylvania. The three cases were based on fire loss to certain premises covered by fire insurance policies issued by the appellees. By consent, they were tried together. The legal plaintiff, Kennedy, was owner of a first mortgage on the premises covered by the insurance policies in suit. The Corn Exchange National Bank, hereinafter referred to as Corn Exchange, owner of a second mortgage on the same premises, commenced foreclosure proceedings. It applied for and paid the premiums on the three fire insurance policies in suit. Each policy contained, inter alia, the following three clauses:

"Loss or damage, if any, under this Policy, shall be payable to John M. Kennedy, 3rd, as mortgagee, (or trustee) as interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property. * * *"

"It is understood that the buildings insured hereunder are now under foreclosure proceedings by the Corn Exchange National Bank & Trust Co. The premium being paid by the Corn Exchange National Bank & Trust Co. it is agreed that in event of loss, same will be adjusted with the Corn Exchange National Bank & Trust Co. and paid to them and John M. Kennedy, 3rd, Mortgagee, as interest may appear."

"This Company reserves the right to cancel this Policy at any time as provided by its terms, but in such case this Policy shall continue in force for the benefit only of the mortgagee (or trustee) for ten days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and this Company

*Writ of certiorari granted 57 S. Ct. 670, 81 L. Ed. —.

shall have the right, on like notice, to cancel this agreement."

After the bid at the sheriff's sale following judgment in the foreclosure suit, Winnet, attorney for the second mortgagee, Corn Exchange, orally advised Kennedy of the intention of Corn Exchange to abandon the property and cancel the policies. Corn Exchange returned the policies to the appellees. Prior to the expiration date of the policies, the premises were destroyed by fire. Thereafter Kennedy assigned his interest to Anna L. Bogash, the use plaintiff.

The issue is whether the policies were in force at the time of the fire or whether Kennedy had acquiesced in their cancellation. At the trial sufficient emphasis was placed upon the question whether the conversation between Kennedy and Winnet amounted to a consent by Kennedy to a cancellation of the policies. This issue was presented to the jury which, by its verdict, must have decided it in the affirmative. Another equally important question—that of notice—was overlooked. The appellant contends that by reason of the hereinbefore quoted covenant regarding notice, Kennedy was entitled to notice by the appellees of cancellation, that the failure of the insurance companies to notify Kennedy of the cancellation of the policies prevented the cancellations from being effective as to him, and that, therefore, as to Kennedy, they were in full force and effect at the time of the fire. This court has ruled that a mortgagee clause in a fire insurance policy results in an entirely separate insurance of the mortgagee's interest, which is not affected by acts of the owner. Queen Ins. Co. v. People's Union Sav. Bank (C.C.A.) 50 F.(2d) 63. Applying this principle to the instant case, the act of the second mortgagee in tendering the policies for cancellation does not affect the rights of the first mortgagee to notice of cancellation expressly guaranteed him by the above-quoted clause of the insurance policies. We think that the question whether Kennedy's conversation with Winnet amounted to a waiver of his right to notice of cancellation was one of the fact issues which should have been presented to the jury and that the refusal of the trial court to charge on points involving the question of notice amounted to reversible error. The judgments are reversed and new trials ordered.

On Petitions for Rehearing.

DAVIS, Circuit Judge.

These cases are here on petitions for rehearing.

In our former opinion we said:

"Each policy contained, inter alia, the following three clauses:

" 'Loss or damage, if any, under this Policy, shall be payable to John M. Kennedy, 3rd, as mortgagee, (or trustee) as interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property. * * *'

" 'It is understood that the buildings insured hereunder are now under foreclosure proceedings by the Corn Exchange National Bank & Trust Co. The premium being paid by the Corn Exchange National Bank & Trust Co. It is agreed that in event of loss, same will·be adjusted with the Corn Exchange National Bank & Trust Co. and paid to them and John M. Kennedy, 3rd, Mortgagee, as interest may appear.'

" 'This Company reserves the right to cancel this Policy at any time as provided by its terms, but in such case this Policy shall continue in force for the benefit only of the mortgagee (or trustee)' for ten days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and this Company shall have the right, on like notice, to cancel this agreement.'

"After the bid at the sheriff's sale following judgment in the foreclosure suit, Winnet, attorney for the second mortgagee, Corn Exchange, orally advised Kennedy of the intention of Corn Exchange to abandon the property and cancel the policies. Corn Exchange returned the policies to the appellees. Prior to the expiration date of the policies the premises were destroyed by fire. Thereafter Kennedy assigned his interest to Anna L. Bogash, the use plaintiff.

"The issue is whether the policies were in force at the time of the fire or whether Kennedy had acquiesced in their cancellation. At the trial sufficient emphasis was placed upon the question whether the conversation between Kennedy and Winnet amounted to a consent by Kennedy to a cancellation of the policies. This issue was presented to the jury which, by its verdict, must have decided it in the affirmative. Another equally important question—that of

notice—was overlooked. The appellant contends that by reason of the hereinbefore quoted covenant regarding notice, Kennedy was entitled to notice by the appellees of cancellation, that the failure of the insurance companies to notify Kennedy of the cancellation of the policies prevented the cancellations from being effective as to him, and that, therefore, as to Kennedy, they were in full force and effect at the time of the fire. This court has ruled that a mortgagee clause in a fire insurance policy results in an entirely separate insurance of the mortgagee's interest, which is not affected by acts of the owner. Queen Ins. Co. v. People's Union Sav. Bank (C.C.A.) 50 F.(2d) 63. Applying this principle to the instant case, the act of the second mortgagee in tendering the policies for cancellation does not affect the rights of the first mortgagee to notice of cancellation expressly guaranteed him by the above-quoted clause of the insurance policies."

The following testimony of Mr. Winnet is substantially all that was said with regard to acquiescence:

"Q. After this property had been sold at Sheriff's sale, did you discuss with Mr. Kennedy any question of the surrendering of these policies for cancellation? A. Yes; I did. I tried to get him to buy the policies. We determined that there was no equity, and we were not getting the title on the sheriff's sale—we just decided to abandon our bid, and I asked him if he wanted the policies, and he said how much would they cost, and I told him, and he said he wasn't going to spend another cent on the property, and I said I was going to cancel them. He says, 'You do what you think best. I am not going to spend another cent on them.'

"Q. Following that did you surrender the policies through the Corn Exchange? A. I sent them to Mr. Gottlieb.

"Q. Did you advise Mr. Kennedy? A. I advised Mr. Kennedy sometime after that, telling him I was going to cancel the policies again. Our previous meeting was oral —I mean, we talked this over; I don't think it was over the telephone, as Mr. Kennedy said; although it may have been. I think it was in my office and then, later on, I wrote a letter, and I received no reply to that letter, as far as my recollection goes.

"Q. At the time of the oral conversation what did Mr. Kennedy say when you advised him that you were going to surrender these policies or intended to surrender them? A. He said, 'You do whatever you think is necessary for your client,'—the substance of it: he said, 'you do whatever you think is necessary for your client.'

"Q. Do you have a copy of the letter on the subject of this conversation? A. I believe I handed it to you, Mr. Schell. I believe it has been identified already, if I am not mistaken.

"Q. Is that it (indicating)? A. Yes; that's a copy of the letter that I wrote to Mr. Kennedy on February 6th. Do you want me to read it?

"Q. Yes; read it.

"Mr. Shapiro: I object. There has been no proof that this letter was received. He couldn't answer the question whether he received it or not.

"The Court: He said that he could not say one way or the other or he could not recall.

"Mr. Shapiro: That is right, your Honor.

"Mr. Schell: Are you objecting to it?

"Mr. Shapiro: No; I am not objecting to it.

"By Mr. Schell:

"Q. Do you have a copy of a letter—is this the only copy of the letter which you have, following your conversation with Kennedy? A. It is.

"Q. Was there any other correspondence relative to these policies? A. I think this is the only one, Mr. Schell, after our oral conversation.

"Q. And then, following this communication, what did you do with the policies? A. I don't know how soon, but some time after that I sent them to Mr. Gottlieb; to the bank directly.

"Mr. Schell: I offer in evidence this letter heretofore marked Defendants' Exhibit 1 for identification.

"(The said exhibit reads as follows:

"'February 6, 1932.

"'Mr. John M. Kennedy, 3rd,

"'Widener Building,

"'Philadelphia, Penna.

"'Re: Glenwood Industrial Products Co.

"'Dear Mr. Kennedy:

"'I was wondering whether or not you have covered the property with the necessary insurance.

"'Since we decided to abandon our bids at the Sheriff's Sale, I am handing the vari-

ous policies which were in my possession back to the Bank.

" 'NSW/ES     Very truly yours,')

"And on Rec., p. 151:

"By Mr. Shapiro: Q. Isn't it true that at no time in any of your discussions with Mr. Kennedy did he give you his consent, so far as he was concerned, to cancel the policies? Isn't that true?

"Mr. Schell: That is objected to.

"The Court: The trouble is you are usurping the functions of the jury. Now, ask him what Mr. Kennedy did.

"By Mr. Shapiro: Q. Is it not true that Mr. Kennedy said, when you told him that you were thinking of cancelling these policies, that so far as he was concerned he would not pay any more money and in so far as he was concerned, you could do what you thought best for the interests of your client? A. That's the substance of it.

"Q. Did he ever at any time tell you that you could cancel all these policies? A. He never did."

As we before said, the issue in this case was whether or not the policies were in force as to Kennedy at the date of their expiration. They were admittedly not in force as to the Corn Exchange Bank.

The evidence will not sustain the contention that Kennedy acquiesced in the cancellation of the policies. He told Winnet, attorney of the Corn Exchange Bank, that he was not "going to spend another cent on the property," covered by the policies and he could do what he thought best for his client which admittedly might have involved cancellation. This was in substance all that he said. There was not a word in this conversation about acquiescence on the part of Kennedy in the sense that he was consenting to anything Winnet did as relieving the companies of their contract obligation to give Kennedy notice if they decided to cancel the policies. Neither is there in the letter later written by Winnet to Kennedy. In the letter he said to Kennedy: "I am handing the various policies which were in my possession back to the bank." Winnet was not the agent of the insurance companies, and any conversation or correspondence between him and Kennedy did not and could not release the insurance companies from their written obligation to Kennedy. And, besides, what took place between Winnet and Kennedy was never brought to the knowledge of the companies. The evidence was not sufficient for the jury to spell out of it acquiescence on the part of Kennedy to cancellation so as to relieve the companies of the necessity of giving him notice. It was, therefore, error to submit the question of acquiescence to the jury.

If Kennedy did not acquiesce in the cancellation of the policies, they were in force as to him.

These policies protected not only the Corn Exchange Bank, but also Kennedy. They constituted a contract between him and the companies, and whatever the Corn Exchange Bank did, Kennedy had the contractual right to notice of cancellation by the companies and the policies continued in force for the benefit of him for ten days after notice. No notice to Kennedy was ever given by the companies and without such notice the policies could not be canceled. They expressly provide that "then," when the notice of cancellation has been given, "this company shall have the right * * * to cancel this agreement," but not until then. Kennedy had the right to rely upon this provision in the policies and the record is devoid of anything which took it away from him.

■ There were no factual contradictions in the evidence. This was assumed to be true by the parties. The plaintiff requested him to instruct the jury, "that under the evidence and the pleadings, your verdict must be for the plaintiff," and the defendant requested him to instruct the jury that, "under the pleadings and the evidence, the verdict must be for the defendants." The rule of law is well established that "where both parties request a peremptory instruction and do nothing more they thereby assume the facts to be undisputed and, in effect, submit to the trial judge the determination of the inferences proper to be drawn therefrom." Williams v. Vreeland, 250 U.S. 295, 298, 39 S.Ct. 438, 439, 63 L.Ed. 989, 3 A.L.R. 1038. The action of the parties took the case from the jury and there was nothing for it to pass upon. In any event, the evidence will not sustain the verdict for the defendant. We did not go quite far enough when the case was here before.

Under the authority of Baltimore & Carolina Line, Inc., v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636, and Kaeppel v. Mutual Life Insurance Company of New York (C.C.A.) 78 F.(2d) 899, the petition for rehearing is denied, and the case remanded to the District Court, with direc-

tions to enter judgment for the plaintiff for $11,000, with interest thereon from March 25, 1932, the amount counsel agreed to be due the plaintiff if she is entitled to a judgment.